<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ANTHONY E. STEVENSON, | : | |
| Plaintiff, | : : | Civ. No. 13:5953 (GC) (TJB) |
| v. | : : | |
| THE COUNTY SHERIFF'S OFFICE OF MONMOUTH, | : : | **OPINION** |
| Defendants. | : : : | |

**CASTNER, District Judge**

This matter comes before the Court on a motion for summary judgment brought by Defendants Leonard Maxfield, Douglas Hermann, and Robert Fuller ("Defendants"). Plaintiff Anthony E. Stevenson's ("Plaintiff") Verified Amended Complaint alleges that Defendants violated his civil rights under 42 U.S.C. § 1983 by using excessive force against him at Monmouth County Superior Court on July 30, 2013. For the reasons explained below, Defendants' motion for summary judgment is DENIED.

    **I.**    **FACTUAL BACKGROUND & PROCEDURAL HISTORY**

    **a. Material Facts**

On July 30, 2013, Plaintiff was a pretrial detainee at Monmouth County Correctional Facility in Freehold, New Jersey. (ECF No. 131, Defendants' Statement of Undisputed Material Facts ("DSUMF") at ¶ 1; ECF No. 132, Plaintiff's Responsive Statement of Undisputed Material Facts ("RSUMF" at ¶ 1.) On that date, Plaintiff was transported from Monmouth County Correctional Facility to Monmouth County Superior Court for a child support court hearing.

(DSUMF at ¶ 2; RSUMF at ¶ 2.)  Defendants contend that Plaintiff became verbally abusive toward them in the holding cell (DSUMF at ¶ 3), but Plaintiff contends that he told the officers that he would not cause problems.[1]  (RSUMF at ¶ 3 (citing ECF No. 74, Verified Am. Compl. at ¶¶ 12−14).)  Sheriff's Officer O'Neill then directed abusive and obscene language at Plaintiff. (RSUMF at ¶ 3 (citing Verified Am. Compl. at ¶ 15).)  Plaintiff appears to acknowledge that he responded to the name calling by using obscene language.  (*See* Verified Am. Compl. at ¶ 16.)

It appears undisputed that Defendant Fuller placed Plaintiff in handcuffs and leg shackles connected to a belt prior to Plaintiff's court appearance.  (DSUMF at ¶ 4; RSMF at ¶ 4.)  Plaintiff contends, however, that Fuller placed the shackles as tightly as he could around Plaintiff's ankles and stated: "See how you walk in them."  (ECF No. 132, Pl. Supplemental Statement of Disputed Material Facts "PSMF" (citing Verified Am. Compl. at ¶ 17).)  As Defendants Maxfield and Hermann escorted Plaintiff down the hallway, Plaintiff complained to both officers that his ankles shackles were too tight and insisted that the shackles made it too difficult to continue walking. (DSUMF at ¶ 5; RSMF at ¶ 5.)  Defendants claim that Hermann checked the shackles and observed that they were on correctly and were not too tight (DSUMF at ¶ 6); Plaintiff contends, however, that Hermann simply bent down and looked at the shackles without determining whether they were on correctly.  (RSMF at ¶ 6 (citing Verified Am. Compl. at ¶ 19).)

Maxfield asked Plaintiff if he was refusing to go to the courtroom, and Plaintiff initially said "no" and told Maxfield his shackles were too tight.  Maxfield asked Plaintiff again if he was refusing to go to the courtroom, and this time Plaintiff said "yes."  Maxfield told Plaintiff they

---

[1] Plaintiff relies on his Verified Amended Complaint in opposing summary judgment.  *See, e.g., Reese v. Sparks*, 760 F.2d 64, 67 (3d Cir. 1985) (although a party may not rest on his or her pleadings to create a fact issue sufficient to survive summary judgment, allegations that are based on personal knowledge and which are in a verified complaint may be used to oppose a motion for summary judgment because the complaint can be treated as an affidavit or declaration).

2

would not "put up with" Plaintiff, and he would be taken back to the holding cell.  (PSMF at ¶¶ 5-7 (citing Verified Am. Compl. at ¶¶ 20-22).)  Plaintiff tried to walk back to the holding cell but could not do so.  Plaintiff then told Defendants he would try to walk to the courtroom.  (*Id.* at ¶ 8 (citing Verified Am. Compl. at ¶ 23); *see also* RSMF at ¶¶ 8-9.)  Plaintiff contends that he crouched down only to raise the shackles off his ankles to relieve the pain, when Hermann told him: "You've been talking shit all morning."  (PSMF at ¶ 9 (citing Verified Am. Compl. at ¶ 24).)

Hermann then grabbed Plaintiff by the back of the waist belt, picked Plaintiff up, and slammed him to the floor.  (RSMF at ¶ 10 (citing Verified Am. Compl. at ¶¶ 25-26).)  Hermann then dragged Plaintiff down the corridor, causing Plaintiff to hit his head on the doorframe leading to the foyer.  (*Id.*)  Hermann dropped Plaintiff on the floor inside the foyer, and Fuller grabbed Plaintiff by the waist belt and dragged him through the hallway back to the isolation cells.  (PSUMF at ¶¶ 12-13 (citing Verified Am. Compl. at ¶¶ 27-28).)

Defendants tell a different story and claim that Plaintiff verbally abused Hermann and Maxfield and refused to move, stating that he could not walk due to the shackles.  (DSUMF at ¶ 8.)  Plaintiff, however, denies using any abusive language.  (RSMF at ¶ 8 (citing Verified Am. Compl. at ¶ 18).)  Defendants further contend that Plaintiff refused to comply with Maxfield's and Hermann's order that he either continue walking to the courtroom or return to the holding cell and would not move from the public hallway floor.  (DSUMF at ¶ 9.)

The video footage from the security camera on the East Wing shows Plaintiff being escorted by Maxfield and Hermann through a corridor door.  The door has a glass window in the top portion only.  Plaintiff is almost completely obscured after he goes through the door.  The officer following Plaintiff appears to lean forward or bend down after he goes through the door.  (Exhibit G to Reardon Decl.)  Approximately 45 seconds after Plaintiff goes through the door, the

3

video footage shows Hermann dragging Plaintiff through the door and into the foyer. (*Id.*) Plaintiff's body is motionless and somewhat curled. (*Id.*) Fuller then grabs Plaintiff by the belt and drags him out of view, and the other Defendants follow. (*Id*; s*ee also* Verified Am. Compl. at ¶ 28.)

The parties agree that there is approximately a 42-second skip in the video just after Defendants drag Plaintiff out of view, and Plaintiff questioned whether portions of the incident were deleted. (DSUMF at ¶ 20; RSMF at ¶ 20.) Defendants have provided an affidavit from Lieutenant Elijah Moore who explains that the security camera is motion activated (when it detects a pixel change) and dumps footage to save recording space when no motion is detected. According to Moore, the skip was caused by a lack of movement during that time period.[2] (*See* ECF No. 127-15, Ex. L, Moore Aff. at ¶¶ 3-13.)

Plaintiff claims that when he regained consciousness, he was laying on the floor outside the isolation cells. (RSMF at ¶ 12 (citing Verified Am. Compl. at ¶¶ 28-32).) Defendants attempted to stand Plaintiff up, but he could not stand because he felt excruciating pain in his lower back and his legs were numb.[3] (*Id.*) Defendants then dragged Plaintiff into the isolation cell and left him lying on the floor handcuffed and shackled with his head under the toilet. (*Id.*) Officers Giglio, Fuller, and Maxfield told Plaintiff to "stop faking" and also told him that if he did not get up on his own, they would leave him lying on the floor handcuffed and shackled until 4:30pm. (*Id.*)

---

[2] Defendants have cited to the wrong exhibits in their DSUMF, and Plaintiff disputes these allegations in his RSMF. The Court does not need to resolve the issue of what caused the skip in the security video in order to resolve the summary judgment motion. Therefore, the Court does not credit Defendants explanation or examine it in any detail.

[3] Plaintiff alleges that he had a major surgery on his lower back on February 9, 2010. (PSMF at ¶ 1 (citing ECF Nos. 129-2, 129-3; Verified Am. Compl. at ¶ 37).)

Defendants claim that Giglio asked Maxfield, a certified paramedic, to evaluate Plaintiff and that Maxfield determined that Plaintiff did not have any life threatening injuries and could be returned to Monmouth County Correctional Institution. (DSUMF at ¶ 13.) According to Plaintiff, Maxfield said he would assist Plaintiff but then told the other Defendants that Plaintiff was faking and that there was nothing wrong with him. (RSMF at ¶ 13 (citing Verified Am. Compl. at ¶¶ 34, 39-40).) Maxfield also told the other Defendants to leave Plaintiff on the floor handcuffed and shackled and stated that Plaintiff would eventually get up on his own. (*Id.*)

The parties agree that Plaintiff said he could not get up due to his low back pain. (DSUMF at ¶ 14; RSMF at ¶ 14.) Defendants claim that Officer Giglio called an ambulance. (DSUMF at ¶ 14.) Plaintiff alleges that five to ten minutes after locking Plaintiff in the isolation cell, Officer Giglio told Plaintiff that he reviewed the video footage and that Plaintiff fell to the floor on his own and that he could stay in the cell until 4:30 p.m. Giglio also told Plaintiff "Have it your way" and locked the cell door. (RSUMF at ¶ 14 (citing Verified Am. Compl. at ¶¶ 41-43).) After another five to ten minutes, Sheriff Officers O'Neill and Fischer came to the isolation cell and told Plaintiff the paramedics were on their way. (*Id.*)

The parties agree that the paramedics arrived at the holding cell and evaluated Plaintiff for injuries. Plaintiff was placed in a medical chair and transported to the medical unit for further evaluation at Monmouth County Correctional Facility. (DSUMF at ¶ 15; RSUMF ¶ 15.) Plaintiff contends that Defendants' rough treatment of him continued when they hoisted him out of the medical chair and threw him into the medical van, causing him more pain. (PSMF at ¶ 33 (citing Verified Am. Compl. at ¶ 57).) The paramedics who initially evaluated Plaintiff appear to have

spoken with the officers and recount Defendants' version of events in the "Narrative" portion of the report.[4]  (ECF No. 127-11, Ex. H at 3-4.)

Dr. Hashmi examined Plaintiff at Monmouth County Correctional Facility and provided Plaintiff with pain medications for his back injuries.  (PSMF at ¶ 36-38 (citing Verified Am. Compl. at ¶¶ 62-64; ECF No. 129-4).)

It appears undisputed that Plaintiff was found guilty of a disciplinary charge resulting from this incident and received 15 or 16 days of disciplinary detention.  (*See* ECF No. 127-13, Ex. J at 4; RSMF at ¶ 18.)  Defendants have provided other documents, which purportedly show that Plaintiff has a history of disciplinary infractions that predate this incident.[5]  (*See e.g.*, ECF No. 127-14, Ex. K.)

   b.  **Procedural History**

Plaintiff submitted his original complaint in this action on or about September 3, 2013.  (ECF No. 1 at 22.)  The District Court screened the original complaint for dismissal under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A and permitted only the Fourteenth Amendment excessive force claims and common law assault and battery claims to proceed against Maxfield and Hermann.  (ECF Nos. 11-12.)  The Court dismissed the remaining claims and Defendants.  (*See id.*)

On February 24, 2017, Defendants Maxfield and Hermann filed a motion for summary judgment.  (ECF No. 42.)  On March 23, 2017, the Magistrate Judge terminated the motion for summary judgment to permit Plaintiff to view the video footage of the incident discussed above.

---

[4] Defendants cite to the wrong exhibit in their DSUMF, and Plaintiff disputes the allegations on that basis.

[5] Defendants again cite to the wrong exhibit in their DSUMF, and Plaintiff disputes the allegations on that basis.

(ECF No. 45.)  On February 8, 2018, the Court denied summary judgment on the excessive force claims, denied Defendants' qualified immunity defense, and granted Plaintiff's request to voluntarily withdraw his state law claims.  (ECF Nos. 57-58.)  The Court found there were disputed issues of material fact as to the chain of events that led to the use of force and whether Defendants applied the force in good faith.  (*See* ECF No. 57 at 9.)

Following discovery, Plaintiff identified Fuller as one of the officers involved in the July 30, 2013 incident.  On January 7, 2019, the Magistrate Judge granted Plaintiff leave to submit an amended complaint asserting claims of excessive force and assault and battery against Defendant Fuller based on the video footage.  (ECF No. 72 at 6-7.)  On January 30, 2019, Plaintiff filed his Verified Amended Complaint.  (ECF No. 74 at 17.)

On June 21, 2019, Defendants filed their second motion for summary judgment arguing that the evidence did not support Plaintiff's excessive force claims and that the use of force was objectively reasonable.  (ECF No. 79 at 16-26.)  The Court denied the motion for summary judgment, finding that Defendants were not entitled to qualified immunity and that a jury could conclude that Defendants' use of force was not objectively reasonable.  (ECF No. 89 at 5-9; ECF No. 90.)

On August 24, 2020, the Magistrate Judge appointed counsel to represent Plaintiff.  (ECF No. 96.)  On November 24, 2020, the Magistrate Judge appointed Plaintiff's current counsel, and counsel entered an appearance on January 11, 2021.  (ECF Nos. 101, 104.)  Plaintiff's counsel sought additional discovery, and on August 18, 2022, the Magistrate Judge ordered Defendants to provide internal affairs, disciplinary records, and employment files for the three named Defendants.  (ECF No. 117.)

On March 24, 2023, Defendants filed their third motion for summary judgment, which this Court terminated because it did not contain a statement of material facts pursuant to L. Civ. R. 56.1. (ECF No. 123, 125). Defendants refiled their motion for summary judgment on June 15, 2023 without a separate Rule 56.1 statement. (ECF No. 127.) Plaintiff filed his opposition papers on July 24, 2023, arguing, in part, that the Court should dismiss the motion for failure to comply with the separate statement rule. (ECF No. 129.) The Court required Defendants to supplement the record with the DVD security video and provide a separate Rule 56.1 statement, which Defendants provided on January 11, 2024. (ECF No. 131.) Plaintiff also provided an amended response to Defendants Rule 56.1 statement. (ECF No. 132.) The matter is now fully briefed.

## II. STANDARD OF REVIEW

At summary judgment, the moving party bears the initial burden of demonstrating that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "If reasonable minds could differ as to the import of the evidence," summary judgment is not appropriate. *See id.* at 250-51. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v.*

*Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," no genuine issue for trial exists and summary judgment shall be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

### III. DISCUSSION

#### a. Defendants are not Entitled to Summary Judgment on Plaintiff's Fourteenth Amendment Excessive Force Claims

Defendants argue that they are entitled to summary judgment on Plaintiff's Fourteenth Amendment excessive force claims because the undisputed facts show that they took action to restore discipline in an objectively reasonable manner, based on the facts and circumstances of this case. (ECF No. 127-2, Moving Brief at 13.)

The Court begins by delineating between Eighth and Fourteenth Amendment excessive force claims. The Eighth Amendment protects convicted prisoners from any force applied "maliciously and sadistically for the very purpose of causing harm." *Jacobs v. Cumberland Cnty.*, 8 F.4th 187, 193 (3d Cir. 2021) (citing *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). To be liable under the Eighth Amendment, the defendant must act with a "sufficiently culpable state of mind," and the conduct must be objectively harmful enough to violate the Constitution. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). In *Graham v. Connor*, 490 U.S. 386, 395 (1989), the Supreme Court observed that "[i]t is clear . . . that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Id.* (citing *See Bell v. Wolfish*, 441 U.S. 520, 535–539 (1979). Subsequently, in *Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015), the Supreme Court clarified that the subjective portion of the Eighth Amendment standard does not apply to pretrial detainees. *Id.* ("The language of the two Clauses differs, and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot

9

be punished at all, much less 'maliciously and sadistically.'" (quoting *Graham*, 490 U.S. at 398 n.11).) Thus, "'a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable.'" *Jacobs*, 8 F.4th at 194 (quoting *Kingsley*, 576 U.S. at 396-97).

In *Kingsley*, the Court further clarified that the Fourteenth Amendment, like the Fourth Amendment, exclusively employs an objectively-reasonableness standard and that the defendant's subjective intent is immaterial. *Kingsley*, 576 U.S. at 396-97. Objective reasonableness turns on the "facts and circumstances of each particular case." *Kingsley*, 576 U.S. at 397 (citation and quotation omitted). "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* (citation omitted). Those circumstances include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397. "Thus, a court must consider the legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (quotations omitted) (citing *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)).

Here, Defendants argue that they are entitled to summary judgment on Plaintiff's Fourteenth Amendment excessive force claims because they

> used appropriate measures to address the challenge presented at the time of the alleged incident with the Plaintiff who had[] used obscene language toward Defendants since his arrival that morning, (2) refused to follow Defendants' orders while in route from his

> holding cell to the courtroom for his child support hearing; and (3) obstructed his transport from his holding cell to the courtroom by crouching down in the public, unsecure hallway and refusing to move.

(ECF No. 127-2, Defendants' Moving Br. at 13.)  Each of these facts, however, is disputed by Plaintiff.  Plaintiff contends that he did not verbally abuse Defendants in the moments leading up to the incident and denies refusing to move.  Plaintiff contends that he repeatedly told Defendants his shackles were too tight and he bent down briefly to fix the shackles.  Plaintiff further claims that, in response, Hermann grabbed Plaintiff by the back of the waist belt, picked Plaintiff up, and slammed him to the floor.  Hermann then dragged Plaintiff through the door and into the foyer, causing Plaintiff to hit his head on the doorframe leading to the inside foyer.  After Hermann let go of Plaintiff, Fuller dragged Plaintiff by his waistbelt through the hallway to the isolation cell.

Defendants claim that the security footage refutes Plaintiff's version of events.  In *Jacobs*, the Third Circuit succinctly summarized the standard in cases involving security footage:

> At summary judgment, a district court must construe the evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *Bland v. City of Newark*, 900 F.3d 77, 83 (3d Cir. 2018). In qualified-immunity cases, that "usually means adopting . . . the plaintiff's version of the facts," *Scott v. Harris*, 550 U.S. 372 (2007), unless "no reasonable jury could believe it," *id.* at 380. But the existence of a security video presents an "added wrinkle." *Id.* at 378.  In cases where there is a reliable video depicting the events in question, courts must not adopt a version of the facts that is "blatantly contradicted" by the video footage. *Id.* at 380.

8 F.4th at 192 (cleaned up).  Here, the video footage itself does not show, as Defendants contend, Plaintiff cursing at Defendants or crouching down and refusing to move.  Indeed, after Plaintiff goes through the door, he moves out of view of the glass window, and, at best, the officer following Plaintiff appears to stoop or bend down.  Once the door opens, however, the video shows Hermann dragging Plaintiff by his waistbelt.  Plaintiff's body appears motionless and remains that way as Fuller drags him out of view.  Because the security video does not blatantly contradict Plaintiff's

11

version of events, the Court adopts Plaintiff's account for purpose of summary judgment and its qualified immunity analysis below.[6]

Under *Kingsley*, a reasonable jury could find that Defendants' use of force was objectively unreasonable. First, if they accept Plaintiff's version of the incident, jurors could conclude that Defendants did not need to use any force or minimal force and "were not facing a disturbance or any other threat to [courthouse] security." *Jacobs*, 8 F.4th at 195 (explaining that use of force occurred 15 minutes after fight among inmates had ended and the circumstances were calm). A reasonable factfinder could also conclude, if accepting Plaintiff's version of events, that Plaintiff posed no threat to the officers or the public when he bent down to adjust his ankle shackles because he was handcuffed and shackled throughout the incident and had agreed to keep trying to walk to the courtroom. Moreover, nothing in the security footage suggests that Plaintiff was resisting or combative. The initial security footage shows Plaintiff walking slowly and the later footage shows him motionless as he is dragged through the door and then out of view. As explained in *Jacobs*, "[u]nder this set of facts, a jury could find that there was no penological need for any additional force," making the decision to slam Plaintiff to the ground, as Plaintiff alleges, and drag him back to the holding cell "wholly gratuitous and objectively unreasonable." *Id.* at 195–96.

Under the circumstances presented, there remain genuine disputes of material fact with respect to the relationship between the need for the use of force and the amount of force used, the extent of the Plaintiff's injury, the severity of the security problem at issue, the threat reasonably perceived by the officers, and whether Plaintiff's conduct justified the use of force. *See Kingsley*,

---

[6] As noted earlier, the video skips a portion of the incident, but there is no reason to believe that the recorded portions are otherwise unreliable.

576 U.S. at 397. For these reasons, Defendants are not entitled to summary judgment on the Fourteenth Amendment excessive force claims.

### b. Defendants are not Entitled to Qualified Immunity Even if the Court uses the Eighth Amendment Standard

Defendants also claim they are entitled to qualified immunity. An award of qualified immunity protects a government official from civil liability and suit "insofar as [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). This inquiry is limited to the law at the time of the incident, as "an official could not be reasonably expected to anticipate subsequent legal developments." *Harlow*, 457 U.S. at 818. To overcome a defendant's claim of qualified immunity, the court must determine: "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (cleaned up); *see also Williams v. Secretary Pennsylvania Department of Corrections*, 848 F.3d 549, 557 (3d Cir. 2017) ("We first determine whether a right has been violated. If it has, we then must decide if the right at issue was clearly established when violated such that it would have been clear to a reasonable person that her conduct was unlawful."). Pursuant to the Supreme Court's explanation in *Pearson v. Callahan*, those inquiries need not be addressed in sequence; instead, courts are entitled to "exercise their sound discretion" and decide which issue to first address. *See* 555 U.S. 223, 236 (2009). The defendant official is entitled to qualified immunity if either prong is not satisfied. *See id.* at 244-45.

In qualified immunity cases, courts must view the facts in the light most favorable to the plaintiff "unless a video 'blatantly contradict[s]' that version of the facts." *Jacobs*, 8 F.4th at 196 n. 8 (citing Scott, 550 U.S. at 380); *see also Rivera v. Monko*, 37 F.4th 909, 914 (3d Cir. 2022). In

order for the right to be clearly established, "[then-]existing precedent must have placed the ... constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741; *see also Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).  Courts "typically look to Supreme Court precedent or a consensus in the Courts of Appeals to give an officer fair warning that his conduct would be unconstitutional." *Kedra v. Schroeter*, 876 F.3d 424, 450 (3d Cir. 2017).  "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow*, 457 U.S. at 818–19.

Defendants argue that the Eighth Amendment standard controls this Court's qualified immunity analysis because the Supreme Court had not yet decided *Kingsley* in 2013 when the incident occurred.[7]  They further argue that it was reasonable for Defendants to believe that their conduct toward Plaintiff was governed by the Eighth Amendment standard for excessive force based on the prevailing Third Circuit precedent.[8]

The defendants in *Kingsley* made a similar argument after the Supreme Court remanded the matter to the Seventh Circuit:

> The defendants next suggest that they should be able to avoid retrial because they are entitled to qualified immunity. Their argument is a nuanced one. In their view, the decision of the Supreme Court, resolving a circuit split in its decision in this case, altered the substantive law of liability.  Because there was a division among the

---

[7] Plaintiff does not object to analyzing his claims under the Eighth Amendment.

[8] Fifteen years prior to *Kingsley*, the Third Circuit held, in relevant part, that "the Eighth Amendment cruel and unusual punishments standards ... apply to a pretrial detainee's excessive force claim arising *in the context of a prison disturbance*." *Fuentes v. Wagner*, 206 F.3d 335, 347 (3d Cir. 2000) (citations omitted) (emphasis added).  In this specific context, the Third Circuit precedent required pretrial detainees to show not only that force was excessive, but also that the force was applied maliciously and sadistically, which mirrors the test under the Eighth Amendment.  Here, as explained below, a reasonable jury could find that Defendants did not use force to quell a prison (or courthouse) disturbance.

> circuits on the state of the law at the time that they acted, they contend that they cannot be held liable for their actions.

*Kingsley v. Hendrickson*, 801 F.3d 828, 831 (7th Cir. 2015) (remand decision). The Seventh Circuit rejected the defendants' argument because *Kingsley* eliminated only the mental state requirement and the standard for the amount of permissible force remained the same:

> If we were to accept the defendants' argument here, we would untether the qualified immunity defense from its moorings of protecting those acting in reliance on a standard that is later determined to be infirm. Here, before and after the Supreme Court's decision in this case, the standards for the amount of force that can be permissibly employed remain the same. To accept the defense of qualified immunity here, we would have to accept the dubious proposition that, at the time the officers acted, they were on notice only that they could not have a reckless or malicious intent and that, as long as they acted without such an intent, they could apply any degree of force they chose. As we have noted, however, the law clearly established that the amount of force had to be reasonable in light of the legitimate objectives of the institution.

*Kingsley*, 801 F.3d at 832–33; *see also Hopper v. Phil Plummer*, 887 F.3d 744, 755 (6th Cir. 2018) (rejecting this type of argument on similar grounds).

Although the Third Circuit has not addressed this exact issue, in *Jacobs*, 8 F.4th at 195-96, a panel of the court applied *Kingsley* (and not the Eighth Amendment standard) in denying qualified immunity to officers who struck an unarmed, compliant, and non-threatening pretrial detainee even though that incident also predated *Kingsley*. Thus, it is at least questionable whether the Eighth Amendment standard governs this Court's qualified immunity analysis.

Even if the Court analyzes Plaintiff's excessive force claim under the Eighth Amendment, however, Defendants are still not entitled to qualified immunity. The unnecessary and wanton infliction of pain is considered cruel and unusual punishment under the Eighth Amendment. *Hudson*, 503 U.S. at 6. As noted above, an Eighth Amendment claim has an objective and subjective component. *Id*. at 8. That is, the defendant must act with a "sufficiently culpable state of mind," and the conduct must be objectively harmful enough to violate the Constitution. *Wilson*,

15

501 U.S. at 298.  When evaluating excessive force claims, the key inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson*, 503 U.S. at 7; *Ricks v. Shover*, 891 F.3d 468, 480 (3d Cir. 2018).  In making this inquiry, courts examine a number of factors: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts to temper the severity of a forceful response."[9]  *Brooks*, 204 F.3d at 106 (citing *Whitley*, 475 U.S. at 321).  "The objective component of the excessive force inquiry is met when "the inmate's injury was more than de minimis."  *Ricks*, 891 F.3d at 480 (citing *Fuentes*, 206 F.3d at 345).

As noted above, the court must view the evidence in the light most favorable to Plaintiff in conducting it's qualified immunity analysis.  *See Jacobs*, 8 F.4th at 192.  For purposes of this motion only and because the video footage does not blatantly show otherwise, the Court credits Plaintiff's allegations in his Verified Amended Complaint that Defendant Fuller overtightened Plaintiff's ankle shackles and that Plaintiff bent down to adjust the ankle shackles after telling Defendants Hermann and Maxfield that the ankle shackles were painful and too tight.  The Court also credits Plaintiff's allegations in the Verified Amended Complaint that Defendant Hermann responded by knocking Plaintiff to the ground, causing him to hit his head and lose consciousness, and dragging him through the door, and that Fuller then dragged Plaintiff back to the holding cell, accompanied by the other Defendants.

---

[9] Notably, the relevant factors mirror the factors in Fourteenth Amendment cases.  *See Kingsley*, 576 U.S. at 397 (considerations include the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting).

With respect to the first two *Whitley* factors, a jury could find that there was only a need for minimal force or no force at all when Plaintiff bent down to fix his ankle shackles, which Defendants knew were too tight. A jury could also find that Defendant Hermann's decision to throw Plaintiff to the ground and drag him through the door to the foyer was excessive under the circumstances, and that Fuller also used excessive force when he continued to drag Plaintiff, who was motionless and allegedly unconscious, back to the isolation cell.[10]

Defendants appear to focus on the third *Whitley* factor—"the extent of the injury inflicted." *See Brooks*, 204 F.3d at 106. The Supreme Court has held that "the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury." *Wilkins v. Gaddy*, 559 U.S. 34, 34, 38 (2010) ("Injury and force. . . are. . . imperfectly correlated, and it is the latter that ultimately counts."); *Hudson*, 503 U.S. at 9 ("When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. This is true whether or not significant injury is evident.") (citation omitted); *Smith v. Mensinger*, 293 F.3d 641, 649 (3d Cir. 2002) (explaining de minimis nature of injuries may cast doubt on prisoner's account of the incident but that is an issue of fact to be resolved by the fact finder based on all of the evidence). Even a "de minimis" use of force could be "constitutionally significant" where the force is "repugnant to the conscience of mankind." *Brooks*, 204 F.3d at 107 (quoting *Hudson*, 503 U.S. at 9-10). For purposes of this motion, Plaintiff has provided sufficient evidence of injury, and whether Plaintiff's injuries were minor or serious is an issue to be resolved by a jury.

---

[10] Maxfield was present for the use of force and did not intervene to stop Defendants Hermann or Fuller. Defendants have not argued that individual Defendants are entitled to summary judgment or qualified immunity based on their respective roles in the incident, and the Court does not address issues not raised by the parties.

The fourth *Whitley* factor requires the Court to consider the extent of the threat presented by the inmate to the safety of staff and other inmates as reasonably perceived by the responsible officials based on the facts known to them. *Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009). Here, Defendants claim that they dragged Plaintiff out of the public hallway to restore order and diffuse a security threat. A reasonable jury could find, however, that Defendants were not faced with a disturbance or security threat if they credited Plaintiff's claims that he merely bent down to fix his shackles, which were too tight, and did not sit in the hallway, refuse to continue walking to the courtroom, or use obscenities against the officers. Moreover, the comments Defendants allegedly made to Plaintiff prior to and after the incident suggest that they may have acted out of malice or frustration with Plaintiff.

Finally, with respect to the fifth *Whitley* factor, there is no suggestion that Defendants sought to temper their use of force.

The Court next addresses whether the law was clearly established in 2013. In answering this question, Courts first define the right allegedly violated with a "high degree of specificity" and then ask, "whether that right was clearly established at the time of its alleged violation." *Anglemeyer v. Ammons*, 92 F.4th 184, 191 (3d Cir. 2024); *Mack v. Yost*, 63 F.4th 211, 228 (3d Cir. 2023). "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). "Thus, the central question is whether the existing law gave the officer 'fair warning' that his particular conduct was unlawful." *Jacobs*, 8 F.4th at 196 (quoting *Schneyder v. Smith*, 653 F.3d 313, 329 (3d Cir. 2011)).

Here, Plaintiff was cuffed and shackled for the duration of the incident and claims that he reached down briefly to adjust his ankle shackles after repeatedly telling Defendants that the

18

shackles were too tight. Plaintiff contends that Defendants responded by slamming Plaintiff to the ground, causing him to hit his head on the door, and dragging him by his waistbelt back to the holding cell. At issue is whether Defendants were on notice in 2013 that this particular conduct was unlawful. *See Schneyder v. Smith*, 653 F.3d 313, 329 (3d Cir. 2011) (explaining that the central question is whether the existing law gave the officer "fair warning" that his particular conduct was unlawful) (quoting *Hope*, 536 U.S. at 740).

The Supreme Court has made clear that the Eighth Amendment prohibits officers from exposing inmates to gratuitous force divorced from any legitimate penological purpose. *See Hope*, 536 U.S. at 738; *Rhodes v. Chapman*, 452 U.S. 337 (1981). Here, Plaintiff was cuffed and shackled for the duration of the incident and arguably presented no threat to Defendants or the public when he allegedly bent down to adjust his shackles. By 2013, any reasonable officer would have known that it was unlawful under the Eighth or Fourteenth Amendment to throw a shackled and handcuffed prisoner to the ground and drag him across the floor by his waist belt because the prisoner was having difficulty walking and bent down to adjust his shackles. *See Giles v. Kearney*, 571 F.3d 318, 326-327 (3d Cir. 2009) (("[A]t the time of the incident in 2001, it was established that an officer may not kick or otherwise use gratuitous force against an inmate who has been subdued; *see also McDowell v. Sheerer*, 374 F. App'x. 288, 293 (3d Cir. 2010) ("[B]y 2004, it was established that an officer may not ... use gratuitous force against an inmate who has been subdued."); *Cowart v. Erwin*, 837 F.3d 444, 454 (5th Cir. 2016) ("We have little difficulty concluding that in 2009, the time of the incident, it was well-established, in sufficiently similar situations, that officers may not 'use gratuitous force against a prisoner who has already been subdued ... [or] incapacitated'" pursuant to the Eighth Amendment (alteration and omission in original)); *Brown v. Lewis*, 779 F.3d 401, 419 (6th Cir. 2015) ("[S]ince at least 2009, the use of

19

violence against a subdued and non-resisting individual has been clearly established as excessive, regardless of whether the individual had been placed in handcuffs.") (arrestee); *Skrtich v. Thornton*, 280 F.3d 1295, 1303 (11th Cir. 2002) ("By 1998, our precedent clearly established that government officials may not use gratuitous force against a prisoner who has been already subdued or, as in this case, incapacitated.") (convicted prisoner).

In sum, the Court finds that under the *Whitley* factors, Defendants are not entitled to qualitied immunity on prong one.  And because a prisoner's right to avoid gratuitous use of force by corrections officers was clearly established by 2013, the Court also denies qualified immunity on prong two.

## IV.     CONCLUSION

For the reasons stated in this Opinion, summary judgment is **DENIED**.  Prior to setting a trial schedule, the Court will refer this matter to the Magistrate Judge for settlement discussions and administratively terminate this case pending the outcome of those discussions.

DATED: May 3, 2023

_____
GEORGETTE CASTNER
United States District Judge